IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EARL RUHL,** | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| v. | : | NO. 10-3788 |
| | : | |
| **COUNTY OF LANCASTER,** | : | |
| **Defendant** | | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                                   **August 31, 2011**

      Earl Ruhl was employed with the Lancaster County Assessment Office as an appraiser and then clerical worker from March of 1990 until March of 2009.  He was 60 years old at the time he stopped working for the County, and he claims he involuntarily retired or was fired from his position.  His complaint contains causes of action for wrongful termination in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA").  The County has filed a motion for summary judgment arguing, among other things, that Mr. Ruhl is estopped from asserting that he was qualified for his position because he has represented to the Social Security Administration that he was unable to work as of the date of his termination.  For the reasons set forth below, I will grant the motion.

**I.      FACTUAL BACKGROUND**

      Mr. Ruhl began working for the County in its Assessment Office in 1990.  Ruhl Dep. 32:10-13, Jan. 28, 2011.  He started out as an appraiser and in this position, visited homes, farms, and other properties to assess their value.  Id. at 37:13-38:25.  His work

involved driving to and walking around the properties, in addition to speaking to the owners. Id. at 39:13-19; 41:18-23. The first time his job duties changed, sometime in 2002, he stopped doing general appraisal work and instead focused exclusively on farm assessment. Id. at 43:20-45:19. This involved no change in the physical requirements of his position. See id. In 2006, while he was doing an outdoor farm inspection, Mr. Ruhl fell, injuring his shoulder, back, and neck. Id. at 48:18-49:10. He continued working for a period of time after his fall, but ultimately had surgery on his neck in April or May of 2007. Id. at 52:1-12. When he returned to work following his surgery in June or July of 2007, he stopped doing field work as an appraiser, and instead began doing various types of clerical work in the office. Id. at 52:17-54:4. Then, early in 2008, his job duties changed again – this time from performing general clerical duties to acting full-time as the clerical worker in charge of "the Homestead work."[1] Id. at 60:20-61:9. His physical restrictions at that time prevented him from lifting, bending, or standing for more than an hour. Id. at 63:4-13.

Mr. Ruhl was awarded 25 weeks of workers' compensation, worth approximately $14,000, in connection with the neck surgery he underwent in 2007. See Def.'s Statement of Undisputed Material Facts in Support of Motion for Summ. J. ("Def.'s

---

[1] Lancaster County has enacted tax relief legislation allowing for homestead and farmstead tax exclusions applicable to homeowners who maintain their permanent residence, or farm, in a taxing jurisdiction. The "homestead exclusion" essentially lowers the assessed value of the property, thereby reducing the property tax on the home. See http://www.co.lancaster.pa.us (select "Property Assessment" from "Select Department" box; then select "Homestead/Farmstead Exclusion" from options column). It is unclear from the pleadings and evidence specifically what duties Mr. Ruhl had concerning the Homestead program.

2

SUF") ¶ 39; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s SUF") ¶ 39.  Ultimately, Mr. Ruhl collected $30,000 in workers' compensation benefits.  Def.'s SUF ¶ 40; Pl.'s SUF ¶ 40.  He claims he did not do anything wrong in connection with the overpayment, and that he was informed by a supervisor that the mistake was the result of a "computer glitch."  Pl.'s SUF ¶ 40.  In any case, Mr. Ruhl's supervisor, Wendy Chan, discovered the overpayment in February of 2009, and first discussed it with Mr. Ruhl during a meeting she held with him and another supervisor, Denielle McGuire, on March 6, 2009.  Def.'s SUF ¶¶ 41, 48; Pl.'s SUF ¶ 48.  There, they accused Mr. Ruhl of both embezzlement and fraud.  Def.'s SUF ¶¶ 62, 63.  Mr. Ruhl claims Ms. Chan told him during the meeting that he was going to be fired for his actions if he did not retire.  Id. at ¶ 72.  Ruhl retired that day, with the understanding that if he did not, he would be terminated.  Pl.'s SUF ¶¶ 51, 79; Def.'s SUF ¶ 79.

In June of 2009, Mr. Ruhl completed an application for Social Security Disability Insurance ("SSDI").  See Disability Benefit Application, Ex. 6 to Ruhl Dep.  He stated in his application that he was unable to work as of March 6, 2009.  Id.  His application was approved with a disability onset date of March 6, 2009 and he continues to receive SSDI payments today.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

3

R. CIV. P. 56(a). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. FED. R. CIV. P. 56(c). Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

**III.   DISCUSSION**

Under the ADEA,[2] "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  The Supreme Court has ruled that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act."  Gross v. FBL Financial Servs., — U.S. —, 129 S.Ct. 2343, 2350 (2009).  In Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009), the Third Circuit held that the McDonnell Douglas[3] burden-shifting framework is still applicable notwithstanding the Supreme Court's decision in Gross.  It noted that "[w]hile we recognize that Gross expressed significant doubt about any burden-shifting under the ADEA, we conclude that the but-for causation standard required by Gross does not conflict with our continued application of the McDonnell Douglas paradigm in age discrimination cases."  Id. at 691.

Therefore, it is appropriate to apply the McDonnell Douglas framework in analyzing Mr. Ruhl's age discrimination claim.  Under McDonnell Douglas, the plaintiff must first make out a prima facie case of age discrimination.  "After establishing a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action."  Conoshenti v. Public Serv. Elec. & Gas Co.,

---

[2]  The same legal standard applies to both the ADEA and the PHRA and therefore it is proper to address Mr. Ruhl's claims under each statute collectively.  See Kautz v. Met-Pro Corp., 412 F.3d 463, 466 n.1 (3d Cir. 2005) (citing Glanzman v. Metropolitan Management Corp., 391 F.3d 506, 509 n.2 (2004)).
[3]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

364 F.3d 135, 146 (3d Cir.2004). "If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination." Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 n. 4 (3d Cir. 1995).

The County asserts that Mr. Ruhl's claims under the ADEA and PHRA must fail because he has not stated a *prima facie* case of age discrimination. Specifically, the County claims Mr. Ruhl cannot show that he was qualified for his position in the Property Assessment Office because, in applying for and receiving Social Security Disability Insurance ("SSDI"), he stated that he was unable to work due to his physical conditions.

To make out a *prima facie* case of age discrimination under the ADEA, a plaintiff must satisfy four elements: (1) he is at least 40 years of age; (2) he is qualified for the position in question; (3) he has suffered an adverse employment action; and (4) he has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination. See Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995). To be qualified for his position, a plaintiff must have been "performing his job at a level that met his employer's legitimate expectations at the time of his discharge." Detz v. Greiner Indus., Inc., 346 F.3d 109, 119 (3d Cir. 2003). To be found disabled under the Social Security Act, on the other hand, a claimant must not only be unable to perform his "past relevant work," but he must also be unable to perform other jobs that exist in the national economy. Id. at 113 & n.1. It therefore appears that Mr. Ruhl's statement to the SSA

that he was unable to work beginning on March 6, 2009 is inconsistent with his contention in this case that he was qualified to perform clerical work for the County.

In the context of a discrimination claim filed under the Americans with Disabilities Act ("ADA") by a recipient of SSDI, the Supreme Court ruled that:

> pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job[.]

Cleveland v. Pub. Mgmt. Sys. Corp., 526 U.S. 795, 797-98 (1999).  In Detz, the Third Circuit found that the Cleveland analysis applies equally to employment discrimination claims filed under the ADEA.  See 346 F.3d at 117 ("[A] *prima facie* showing under the ADEA that conflicts with earlier statements made to the [Social Security Administration ("SSA")] is subject to the same analysis, as the reasoning of the Court in Cleveland also applies in the context of the ADEA.").  It ruled that a plaintiff's sworn statement to the SSA that he was physically incapable of performing his job "crashe[d] face first" against his assertion, necessary for an ADEA claim, that he was qualified for and capable of performing the job from which he was discharged.  Id.

Cleveland and Detz require a two-part analysis when an employment discrimination plaintiff has applied for and received SSDI benefits.  First, the court must determine whether the positions taken by the plaintiff in his SSDI application and his

7

ADEA claim genuinely conflict. Detz, 346 F.3d at 118. Then, it must evaluate whether the plaintiff's explanation for that inconsistency meets the standard set forth in Cleveland: "to defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job." 526 U.S. at 807. Stated differently,

> [T]he plaintiff must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless consistent with his ability to perform the essential functions of his job.

Detz, 346 F.3d at 118 (citing Lee v. City of Salem, Ind., 259 F.3d 667, 674-75 (7th Cir. 1999)).

Although there is a dispute of fact whether Mr. Ruhl was terminated or fired, it is undisputed that his last day of work was March 6, 2009. See Def. SUF ¶ 82. He filed his application for SSDI benefits on June 25, 2009. See Ruhl Disability Folder, Ex. 32 to Def.'s Motion for Summ. J. ("Ruhl SSDI Folder"). He stated in his application that he was "unable to work" as of March 6, 2009. Id. He claimed that a back injury, neck injury, migraines, and a shoulder injury affected his ability to work. Id. An application summary he received from the SSA confirmed its understanding that he was applying for SSDI on the ground that he "became unable to work because of [his] disabling condition on March 6, 2009." Application Summary for Disability Insurance Benefits, Ruhl SSDI Folder. The Disability Report completed in connection with his application states that he

8

stopped working on March 6, 2009 "[b]ecause of my condition and other reasons[.] My conditions prevented me from performing my job and I was forced to retire." Disability Report – Adult – Form SSA 3368, Ruhl Disability Folder. On this form, he claimed that he is unable to stand or walk for more than ten minutes or sit for more than one hour. He stated that his "conditions cause me to constantly experience a great deal of pain." Id. In response to a question prompting him to describe the job he had performed the longest before the onset of his disability, he responded: "As an Agriculture Appraiser, I drove to farms and measured buildings like barns and sheds and determined how many stories high they were for tax purposes for the county. From July 2007 until my last day of work, I performed my appraisal duties at a desk all day due to my work-related injury." Id. In response to the question, "Did you work at any time after the date your illnesses, injuries, or conditions first interfered with your ability to work?", he answered "Yes." Id. However, he answered "no" to the follow up inquiries as to whether he had therefore worked fewer hours, changed his job duties, or made any job-related changes. Id. He left blank a section inviting him to explain his answers. Id.

     Mr. Ruhl also completed a "Function Report" in connection with his SSDI application. Function Report – Adult – Form SSA 3373-BK, Ruhl Disability Folder. In response to a question concerning what things he could do prior to his illness that he "can't do now," he stated, among other things, "Do my job as an appraiser for the county, which was field work (farms)." Id. In this Report, he also represented that in addition to restrictions on his lifting, standing, and walking abilities, he had a sitting restriction of

one hour.  Id.  An Adult Disability and Work History Report appended as an Exhibit to Mr. Ruhl's deposition testimony indicates that he represented to the SSA that his condition "first interfered with [his] ability to work on [June 17, 2009]."  See Disability Benefit Application, Ex. 6 to Ruhl Dep.  However, on the same form, he stated, as before, that he "stopped working on March 9, 2009 . . . because of my condition and other reasons."  Id.  He further explained that "I worked after my condition first interfered with my ability to work" and then that his "conditions prevented me from performing my job and I was forced to retire."  Id.

On November 17, 2009, he received notice that he qualified for SSDI.  According to the Disability Determination and Transmittal form completed by the SSA dated September 25, 2009, the SSA accepted Mr. Ruhl's assertion that his disability began on March 6, 2009.  Ruhl SSDI Folder.  According to the "Disability Determination Rationale" completed by the SSA, Mr. Ruhl was found too disabled to work in part because he could only sit for six hours in an eight hour workday and was significantly more limited in his ability to stand and walk.  Id.  It also found that "the vast majority of jobs within his industry will require him to perform work at a light exertional level and significant numbers of jobs do not exist in the national economy that are within his industry with a sedentary exertional level."  Id.  The SSA found that Mr. Ruhl could not perform his past work "as he describes it nor as it is performed in the national economy."  Id.

Mr. Ruhl claims there is no inconsistency between his SSDI application and his current discrimination claim.  He argues that "the disability application . . . specifically stated that Plaintiff's conditions *interfered* with Plaintiff's ability to work; it does not say that Plaintiff is prohibited from performing *any* work."  This is a semantic, not a genuine distinction.  A recipient of SSDI benefits is, by definition, unable to perform, and not simply limited in performing, his past relevant work.  See Detz, 346 F.3d at 120.  Mr. Ruhl also described to the SSA how his condition "first interfered" with his ability to work, and still maintained that he was "unable to work" as of March 6, 2009.  This argument is wrong and it is wrong-headed.

Mr. Ruhl also points to a statement on his Adult Disability and Work History Report that his condition "first interfered with [his] ability to work on [June 17, 2009]." He has offered no evidence that this date reflects some change in his physical condition from what it was in March of 2009, when he stopped working.  Instead, it appears that he simply points to this apparent discrepancy in order to "create" an issue of fact.  This argument is also weak.  There are numerous statements throughout his SSDI folder indicating that he became "unable to work" as of March 6, 2009.  More importantly, the Disability Determination and Transmittal he received indicated that the SSA determined he was unable to work as of March 6, 2009.  See Def. Ex. 32.  No reasonable jury would accept that the listing of June 17, 2009 as the date his condition interfered with his ability

to work somehow negates Mr. Ruhl's self-reported and repeated contention that he was unable to work as of March 6, 2009.[4]

The County contends that there is a conflict between Mr. Ruhl's statements to the SSA and his current claims, and that his ADEA and PHRA claims must fail because of "their inconsistency and inability to be reconciled with his SSDI application." Def.'s Mem. in Support of Motion for Summ. J., 5. Mr. Ruhl informed the SSA that his job duties had been altered beginning in July 2007, and that he had performed his duties from his desk starting at that time. However, he still claimed to be unable to work beginning in March of 2009. In other words, he stated that he was able to, and did work after his condition first started to interfere with his work, but maintained that his condition prevented him from performing his job as of March 6, 2009, the date on which he was discharged. The County is correct. A genuine conflict exists between the position Mr. Ruhl advanced in his SSDI application and his current discrimination claim, in which he asserts that he "was and is capable of performing the . . . clerical position that he was performing at the time of his involuntary retirement/termination." Pl.'s Resp. to Def.'s SUF ¶ 128.[5]

---

[4] In fact, since Mr. Ruhl explained during his deposition that his position with the County changed from an active field-based appraiser position to a desk position in June of July of 2007, see Ruhl Dep. at 52:1–25, it appears likely that the June, 2009 date is a clerical error. Mr. Ruhl's condition clearly did begin interfering with his work in June or July of 2007, when he returned to work following surgery and began his clerical position.

[5] In Detz, the Third Circuit summarized the conflict this way: "In short, Detz informed the SSA in a sworn statement that his disability prevented him from working – in other words, that he was physically *incapable* of performing his job. Now he seeks to advance a position before this Court that rests on the assertion that he was discharged from a position that he was physically *capable* of performing. This

The next step of the analysis is to determine whether Mr. Ruhl has proferred a sufficient explanation for this conflict such that he should survive summary judgment. Mr. Ruhl claims to have provided such an explanation during his deposition. He states that though he is unable to perform the field work required of his previous position, he is able to perform the clerical work he was doing at the time of his termination. Ruhl Dep. 93:14-25; 95:5-14; Pl.'s Resp. to Def.'s SUF ¶ 128 ("Plaintiff clearly testified that although he was not able to perform the fieldwork, he was able to perform the office work. Notwithstanding Plaintiff's restrictions, he was clearly able to perform his office work." (citing Ruhl Dep. at 93:22-25, 94:17-95:4, 95:10-14)).

In Detz, the court rejected a similar explanation in a factual situation much like Mr. Ruhl's. There, the plaintiff began working for the defendant on a road crew as a millwright, doing physical outdoor work using machines and tools. Detz, 346 F.3d at 111. After he suffered an injury to his arm, he became unable to manipulate equipment or perform heavy lifting. Id. at 111-112. As a result, he was assigned to "light duty" work in a tool room for the two years prior to his termination. Id. at 112. On his SSDI application, he indicated that he stopped working due to his physical conditions on the date of his layoff, meaning he was unable to do even the light work in the tool room. Id. After his SSDI application was approved, the plaintiff filed an ADEA claim, and contended "that he was . . . capable of continuing to perform his light duties in the Tool

---

second position 'crashes face first against' his prior claim.'" 346 F.3d at 119-120 (emphasis in original) (internal citation omitted).

Room and, therefore, should be deemed 'qualified' for that position for purposes of his claim under the ADEA." Id. at 119. The court found his explanation insufficient under Cleveland, because it was "no more than a further contradiction of his initial assertion, and it does nothing to reconcile his previous two assertions – one that he was unable to work, and the other that he could perform the job from which he was terminated." Id. It further observed that:

> Had Detz's SSA Application indicated that, while he could still perform work in the Tool Room, his disability prevented him from obtaining most other jobs, we might view his later claim to be reconciled with his earlier assertions. But Detz indicated nothing of the sort when he described how his disability affected his work.

Id. at 120-121.

The facts here are really no different. Mr. Ruhl represented numerous times to the SSA that, due to his various medical conditions, he became *unable to work* on the day he was discharged. He argues on summary judgment that he *is* able to perform the clerical duties he had for the last year of his employment. His "explanation" for this inconsistency consists of repeated assertions that his injuries do not preclude him from working. Pl.'s Resp., 5. However, this is not an explanation sufficient under Cleveland, but rather a "further contradiction." See Detz, 346 F.3d at 120. The fact that Mr. Ruhl articulated a difference between his field-based and clerical duties on his SSDI application, and still claimed an inability to work beginning on March 6, 2009 (a date well after he began performing clerical work), negates any contention that he might have misunderstood the nature of his application or meant only to represent that he was unable

14

to perform field duties. As the Court in <u>Detz</u> observed, a claimant could seek SSDI on the ground that he is able to perform his current job but prevented by his disability from obtaining most other jobs. But neither the plaintiff in <u>Detz</u> nor Mr. Ruhl made any such assertion.

 Mr. Ruhl's other prominent argument, or explanation, for this conflict is his assertion that he was able to perform the functions of his job with a reasonable accommodation. <u>See</u> Pl.'s Resp., 6-7. While an employer carries a duty to provide reasonable accommodations for employees under the ADA, the same duty does not apply under the ADEA. <u>See</u> <u>Detz</u>, 346 F.3d at 120. Under the ADEA, an employee must be physically capable of performing the functions of his job. <u>Id.</u> Therefore, "it is important to note that while reasonable accommodations may make a worker qualified under the ADA, accommodations do not have the same effect for an ADEA claim. <u>Cornell v. Severn Trent Envtl. Servs., Inc.</u>, No. 05-0262, 2005 WL 2035861 at *3 (M.D.Pa. Aug. 24, 2005). Regardless of the importance of accommodations under the ADEA, Mr. Ruhl's argument still fails. He claims that he *was* performing his job with an accommodation starting when he returned from his 2007 surgery. Pl.'s Resp., 6 ("Had Defendant continued to provide Plaintiff with accommodations . . . there is no question that Plaintiff would be able to continue to perform his work."). However, he still has not reconciled that statement with the fact that he represented to the SSA on numerous occasions that he was *unable* to work as of March 6, 2009. In explaining his situation to the SSA, he stated that he had begun performing his duties from his desk in 2007, but that

he was unable to work in 2009. In other words, Mr. Ruhl essentially told the SSA that he was being accommodated, and nonetheless claimed an inability to perform that accommodated position.

## IV.     CONCLUSION

Mr. Ruhl has failed to provide an explanation for the conflict between his position before the SSA that he was unable to work as of March 6, 2009, and his position before this Court that he was qualified for the job just prior to that date. Therefore, under Cleveland and Detz, he is estopped from asserting that he was qualified for his position. He is therefore unable to prove his *prima facie* case of discrimination under the ADEA and the PHRA, and the County is entitled to summary judgment.